UNITED STATES DISTRICT COURT
EASTERN DISTIRCT OF MICHIGAN
SOUTHERN DIVISION

ZANTAZ ENTERPRISE ARCHIVE
SOLUTIONS, LLC f/k/a CPAX
DISCOVERY, LLC,

      Plaintiff,

v.

MIDMICHIGAN HEALTH and MID-
MICHIGAN HEALTH SYSTEMS,
INC.,

      Defendants.

Case No. 23-cv-10932-VAR-APP

Hon. Victoria A. Roberts

Magistrate Judge Anthony P. Patti

## SECOND AMENDED COMPLAINT

Plaintiff Zantaz Enterprise Archive Solution, LLC f/k/a Capax Discovery, LLC ("Plaintiff" or "Zantaz"), by its attorneys, for its Second Amended Complaint against Defendant MyMichigan Health f/k/a MidMichigan Health and f/k/a Mid-Michigan Health Care Systems, Inc. ("MyMichigan" or "Defendant"), alleges upon knowledge as to itself, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This case concerns Defendant's unauthorized use of Plaintiff's

1

1711100

proprietary and licensed software without compensation in violation of governing law and agreements entered between the parties.

## PARTIES

2. Plaintiff Zantaz is a limited liability company organized and existing under the laws of New York, with its principal place of business located in Erie County, New York.

3. Upon information and belief, Defendant MyMichigan is a corporation organized and existing under the laws of Michigan, with its principal place of business located in Midland County, Michigan.

## JURISDICITION AND VENUE

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as this is an action between citizens of different States and the amount in controversy exceeds $75,000 exclusive of interest and costs.

5. Venue is proper in this Court pursuant to consent of the parties and Stipulation and Order executed by the parties on April 5, 2023, and So Ordered by Hon. Jennifer H. Rearden, U.S.D.J. on April 19, 2023. (Dkt. 2).

## BACKGROUND

6. Zantaz owns and possesses the right to license various proprietary software products related to data archiving, management, storage, protection,

2

1711100

exportation, and migration.

7. Zantaz earns revenues by both (1) licensing its software products for use of third-party clients in exchange for the payment of licensing fees and (2) providing technical maintenance and support services to its third-party licensee clients for the licensed software in exchange for support services and maintenance fees.

8. At the relevant times, third-party Autonomy, Inc. ("Autonomy") owned the software product referred to herein as "NearPoint" and all licensing rights related thereto, as well as all maintenance and support agreements for the NearPoint software product.

9. The NearPoint software product is used to archive email mailboxes and data.

10. Pursuant to a Software Support and Maintenance Agreement entered directly between MyMichigan and Zantaz, effective April 1, 2014, Zantaz agreed to provide MyMichigan premium maintenance and support services the 4,000 NearPoint licenses it had at that time. (A true and correct copy of the Software Support and Maintenance Agreement is annexed hereto as ***Exhibit 1***).

11. Pursuant to a Source Code License Agreement entered between Zantaz and third-party Autonomy, dated July 28, 2014, Zantaz obtained the

3

exclusive licensing rights to the NearPoint software, including MyMichigan's pre-existing 4,000 NearPoint licenses. (A true and correct copy of the Source Code License Agreement is annexed hereto as *Exhibit 2*).

12. Pursuant to an Assignment of Support Contracts Agreement entered between Zantaz and Autonomy, also dated July 28, 2014, Zantaz also obtained the rights and obligations to Autonomy's maintenance and support services contracts for its licensed NearPoint software, which included and listed MyMichigan and its then-support contract for its NearPoint licenses. (A true and correct copy of the Assignment of Support Contracts Agreement is annexed hereto as *Exhibit 3*).

13. Based on the foregoing, Zantaz owned all rights related to licenses of the NearPoint software product and to provide support and maintenance and support services for licensees using the NearPoint software product, including but not limited to the pre-existing NearPoint licensee and support customer MyMichigan.

14. A NearPoint software license is required for each user mailbox for which the NearPoint software product was used to archive an email mailbox and data, as well as each user mailbox actively using NearPoint to archive email data. An end user is prohibited from using one NearPoint license to fully archive an email mailbox, and then use the same NearPoint licenses to archive another email

4

1711100

mailbox. That would require two NearPoint licenses. In other words, one NearPoint license is equivalent to one archived email mailbox whether the email mailbox was actively archiving new data or not.

15. MyMichigan knew and understood that a NearPoint license was required for each mailbox that used or is using the software, regardless of whether the archived mailbox was active.

16. On September 30, 2014, MyMichigan purchased from Zantaz (1) 1,500 "Additional mailbox licenses," which authorized MyMichigan to use NearPoint for an additional 1,500 mailboxes, and (2) maintenance and support services for the additional NearPoint "1500 mbox licenses." (A true and correct copy of the Invoice 2604 is annexed hereto as *Exhibit 4*).

17. On October 18, 2017, MyMichigan purchased from Zantaz 1,000 additional NearPoint licenses and maintenance and support for those additional licenses. (A true and correct copy of the Invoice 2105 is annexed hereto as *Exhibit 5*).

18. On March 14, 2018, MyMichigan purchased from Zantaz 650 additional NearPoint licenses and maintenance and support for those additional licenses. (A true and correct copy of the Invoice 2220 is annexed hereto as *Exhibit 6*).

19. Based on the foregoing, MyMichigan purchased and was authorized to use a total of 7,150 NearPoint licenses equating to 7,150 mailboxes using or that used the NearPoint software.

20. The NearPoint software product was provided to third-party licensees, including MyMichigan, via electronic download.

21. In order for a third-party licensee to install, activate, and use the licensed NearPoint software on an email mailbox, the third-party was required to agree to Zantaz's End User License Agreement ("EULA") to complete the software installation and activation. (A true and correct copy of the EULA is annexed hereto as *Exhibit 7*).

22. Thus, MyMichigan agreed to a separate EULA every time it installed and activated the NearPoint software for use on an email mailbox.

23. Pursuant to their terms, the EULAs are interpreted and enforced in accordance with and shall be governed by the laws of the State of New York.

24. Pursuant to each EULA, MyMichigan obtained a license to use NearPoint for business purposes subject to the terms of the EULA, including but not limited to the full and timely payment of the licensing fees to Zantaz.

25. The EULAs provided Zantaz, among other things, the right to audit MyMichigan's software use, and required MyMichigan to pay underpayments for

6

1711100

use of NearPoint licenses discovered by Zantaz.

26. Once an end user such as MyMichigan installs and activates the NearPoint software, it can again install and activate the NearPoint software for use on additional mailboxes at any time by following the original installation process, which includes agreeing to the EULA.

27. Thus, a third-party licensee has the ability to use more NearPoint licenses than authorized and paid for without Zantaz's knowledge, until and unless Zantaz discovers the true number of mailboxes that used or are using the NearPoint software.

28. Based on the foregoing, MyMichigan agreed to terms of the EULA every time it installed and activated the NearPoint software for one of its mailboxes, including when MyMichigan installed and activated NearPoint licenses in addition to and above the 7,150 NearPoint licenses it was authorized to used and paid for.

29. In November 2018, Zantaz inquired regarding the number of NearPoint licenses MyMichigan was using and whether MyMichigan was using more NearPoint licenses than the 7,150 it was authorized to use and paid for.

30. MyMichigan confirmed its understanding that a NearPoint license is required for each individual user email mailbox whether active or inactive.

31. Pursuant to its communication with MyMichigan regarding its NearPoint use, based on MyMichigan's representations, in March 2019 Zantaz believed that MyMichigan was using more NearPoint licenses than they were authorized to use.

32. In addition, the parties' NearPoint software maintenance and support agreement was set to expire and was up for renewal at the end of March 2019.

33. In March 2019, MyMichigan requested (1) a quote for a "true-up" purchase of 323 additional NearPoint licenses and (2) a quote for a one-year renewal of the parties' NearPoint software maintenance and support agreement.

34. Although, in March 2019, MyMichigan requested a quote to renew its agreement with Zantaz for maintenance and support, at that time, unbeknownst to Zantaz, MyMichigan had already been migrating off the NearPoint software.

35. Therefore, although MyMichigan requested a NearPoint maintenance and support quote in March 2019, MyMichigan did not intend to enter a renewal maintenance and support agreement because it was migrating off NearPoint.

36. Upon information and belief, MyMichigan led Zantaz to believe that it was interested in renewing its NearPoint maintenance and support to gain bargaining leverage for a true-up licensing quote of NearPoint licenses.

37. On March 29, 2019, Zantaz issued MyMichigan (1) a true-up quote

8

for an additional 323 NearPoint licenses and (1) a quote for an additional year of maintenance and support for NearPoint software.

38. In April 2019, MyMichigan purchased an additional 323 NearPoint licenses pursuant to the quote, bringing its total of paid for and authorized NearPoint licenses to 7,473.

39. MyMichigan, however, did not renew the support and maintenance agreement because, unbeknownst to Zantaz, MyMichigan was already migrating off the NearPoint software.

40. Thereafter, in April 2021, in connection with Zantaz's NearPoint license audit inquiries and requests for information, MyMichigan provided Zantaz a report evidencing that MyMichigan used NearPoint for 12,930 mailboxes.

41. Based on the foregoing, although MyMichigan paid for and was licensed and authorized to use the NearPoint software product for 7,473 mailboxes, MyMichigan used the NearPoint software product 12,930 mailboxes.

42. Therefore, MyMichigan used 5,457 licenses for the NearPoint software product for which it was not authorized and did not pay.

43. Zantaz's price for licensed and authorized use of the NearPoint software product is $40 per license/mailbox.

44. In April 2021, Zantaz requested that NearPoint pay $218,280 for the

5,457 NearPoint licenses it used but did not pay for.

45. Despite due demand, MyMichigan failed and refused to compensate Zantaz for its unauthorized and additional use of 5,457 licenses of the NearPoint software product.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

46. Plaintiff repeats and reallege the foregoing paragraphs as if set forth herein in full.

47. Pursuant to a Source Code License Agreement and the Assignment of Support Contracts Agreement, Zantaz obtained the exclusive license rights to the NearPoint software product.

48. MyMichigan knew and understood that Zantaz obtained all rights to licenses the NearPoint software product and to provide maintenance and support services related to licensees' use of the NearPoint software product, as evidenced by the fact that MyMichigan purchased additional NearPoint licenses from Zantaz on multiple occasions and entered multiple agreements and renewals for Zantaz to provide maintenance and support services for MyMichigan's NearPoint software licenses.

49. MyMichigan entered and agreed to the terms of the EULA every time

it installed and activated NearPoint for use on an email mailbox.

50. My Michigan required a NearPoint license for every email mailbox that used NearPoint, whether active or inactive.

51. MyMichigan committed material and substantial breaches the EULA's, including:

    a. Using the NearPoint software product for 12,930 user mailboxes although it had only purchased and was only authorized to use licenses for 7,473 user mailboxes;

    b. Failing to notify Zantaz that it was using more licenses for the NearPoint software product than it purchased and was authorized to use, in apparent attempt to conceal its unauthorized use of Zantaz's software; and

    c. Refusing and failing to pay for additional licenses and its unauthorized use of the NearPoint software product despite Zantaz's demand for such payment.

52. Pursuant to the terms the EULAs, Plaintiff is entitled to recover from Defendant a late charge at the rate of 1.5% per month on unpaid balances until payment is delivered and the costs and expense of collecting unpaid amounts, including attorney's fees.

1711100

53. As a direct and proximate result of Defendant's breaches, Plaintiff has suffered, and will continue to suffer, substantial monetary damages.

54. By reason therefor, Plaintiff seeks and is entitled to a judgment against Defendant for all damages caused by their breaches of contract in an amount to be proven at trial, but not less than $218,280, plus interest at the contractual rate of rate of 1.5% per month, plus attorney's fees and costs.

## SECOND CAUSE OF ACTION
**(Unjust Enrichment)**

55. Plaintiff repeats and reallege the foregoing paragraphs as if set forth herein in full.

56. Plaintiff obtained the exclusive rights to license the NearPoint software product at significant cost, time, expense and business risk.

57. Defendant was and is not entitled to use the NearPoint software product without Plaintiff's authorization and without compensating Defendant for such use.

58. Defendant knew and understood that Plaintiff owned the exclusive rights to license the NearPoint software product, and that Defendant was not authorized to use the NearPoint software product without Plaintiff's authorization and consent.

59. Defendant used numerous licenses for the NearPoint software product for its own benefit, without Plaintiff's authorization or consent, and without compensating Plaintiff therefor.

60. Defendant benefited from its unauthorized use of licenses for the NearPoint software product at the Plaintiff's expense.

61. Equity and good conscience require that Defendant compensate Plaintiff for its unauthorized use of licenses for the NearPoint software product.

62. By reason therefor, Plaintiff seeks and is entitled to a judgment against Defendant for the value of the additional licenses that Defendant used in an amount to be proven at trial, but not less than $218,280, plus statutory interest.

**WHEREFORE**, Plaintiff demands judgment against Defendant:

1. On the First Cause of Action, an award of damages in an amount to be proven at trial, but not less than $218,280, plus interest at the contractual rate of rate of 1.5% per month, plus attorney's fees and costs.

2. On the Second Cause of Action, an award of damages in an amount to be proven at trial, but not less than $218,280, plus statutory interest.

3. Plaintiff's costs and expenses incurred in this action.

4. Such further relief as the Court finds just and proper.

                    Respectfully submitted,

                    /s/ *David E. Plunkett*
                    David E. Plunkett (P66696)
                    WILLIAMS, WILLIAMS, RATTNER & PLUNKETT, P.C.
                    *Attorneys for Plaintiff*
                    380 N. Old Woodward, Suite 300
                    Birmingham, MI   48009
                    (248) 642-0333
                    dep@wwrplaw.com

                    Charles C. Ritter
                    Steven W. Klutkowski
                    DUKE, HOLZMAN, PHOTIADIS & GREENS LLP
                    *Attorneys for Plaintiff, not yet admitted to EDMI Bar*
                    701 Seneca Street, Suite 750
                    Buffalo, New York 14210
                    (716) 855-1111
                    critter@dhpglaw.com
                    sklutkowski@dhpglaw.com

Dated: May 19, 2023

1711100