UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ZANTAZ ENTERPRISE ARCHIVE
SOLUTIONS, LLC,

          Plaintiff,          Case No. 1:23-cv-10932

v.          Honorable Thomas L. Ludington
          United States District Judge

MIDMICHIAN HEALTH, and MID-MICHIGAN
HEALTH CARE SYSTEMS, INC.
          Honorable Patricia T. Morris
          Defendants.          United States Magistrate Judge
_____/

**OPINION AND ORDER (1) SUSTAINING PLAINTIFF'S OBJECTION TO REPORT AND RECOMMENDATION; (2) ADOPTING REPORT AND RECOMMENDATION IN PART; (3) OVERRULING REPORT AND RECOMMENDATION IN PART; AND (4) DENYING DEFENDANTS' MOTION TO DISMISS**

Plaintiff Zantaz Enterprise Archive Solutions, LLC licensed an email-archival software known as "NearPoint" to Defendants MidMichgian Health and Mid-Michigan Health Care Systems, Inc. (collectively "MyMichigan"). According to Plaintiff, each NearPoint license authorizes the software's use on only one email account, so using one license to archive multiple email accounts exceeds the license's authorized use. However, once MyMichigan purchased NearPoint licenses, end-user MyMichigan employees could install the software on multiple email accounts. In April 2021, MyMichigan reported to Plaintiff that it was using NearPoint to archive 12,930 email accounts, despite having only purchased 7,473 licenses. Because Plaintiff charged $40 per NearPoint license, Plaintiff demanded $212,280 from Defendants to compensate for the 5,457 MyMichigan email accounts using NearPoint without a license. But Defendants did not pay and Plaintiff sued, alleging Defendants breached the End User Licensing Agreements (EULAs)

each user agreed to before installing NearPoint on their computers and using NearPoint to archive email accounts. Plaintiffs also alleged an alternative unjust enrichment claim.

Defendants filed a joint motion to dismiss in June 2023, which was referred to Magistrate Judge Patricia T. Morris for a report and recommendation (R&R). In January 2024, Judge Morris issued her recommendation that this Court grant Defendants' Motion in part, dismissing only the breach of contract claim because Plaintiff did not plausibly connect Defendants' alleged conduct to any specific EULA provision. Plaintiff objected. Upon *de novo* review, for reasons explained below, Plaintiff's Objection will be sustained, the R&R will be overruled to the extent it recommended dismissal of Plaintiff's breach of contract claim, and Defendants' Motion to Dismiss will be denied in its entirety.

I.

Defendants MidMichigan Health and Mid-Michigan Health Systems, Inc. collectively operate a large non-profit healthcare system known as "MyMichigan Health," which provides healthcare services to nearly one million people throughout 25 counties in Michigan. *See An Overview of MyMichigan Health*, MYMICHIGAN HEALTH, https://www.mymichigan.org/about/ (last visited March 3, 2024) [https://perma.cc/E5U4-YH2D]. Plaintiff Zantaz Enterprise Archive Solutions, LLC, is a New York company which possesses the right to license various data-archival and management software, sells these licenses to end-user clients, and provides clients with corresponding technical support and software maintenance. ECF No. 6 at PageID.12–13.

This case involves "NearPoint," a software used to archive emails. *Id.* at PageID.13. NearPoint, and its licensing rights, were originally owned by Autonomy, Inc. ("Autonomy"), a nonparty. *Id.* In April 2014, Defendants—who had 4,000 NearPoint licenses at the time—hired

Plaintiff to provide technical support for these licenses pursuant to a singed Software Support and Management Agreement. *Id.*; *see also* ECF No.6-2.

In July 2014, Plaintiff acquired the exclusive right to license NearPoint from Autonomy. ECF No. 6 at PageID.13–14; *see also* ECF No. 6-3. Autonomy also assigned Plaintiff all its outstanding support-services contracts for the NearPoint software. ECF No. 6 at PageID.14; *see also* ECF No. 6-4.

In September 2014, Defendants purchased 1,500 additional NearPoint licenses directly from Plaintiff, and purchased Plaintiff's technical support services, too. ECF No. 6 at PageID.15; *see also* ECF No. 6-5. The next month, Defendants purchased an additional 1,000 NearPoint licenses and Plaintiff's corresponding technical support. ECF No. 6 at PageID.15; *see also* ECF No. 6-6. In March 2018, Defendants purchased another 650 NearPoint licenses and Plaintiff's support. ECF No. 6 at PageID.15; *see also* ECF No. 6-7. So, as of March 2018, Defendants owned a total of 7,150 NearPoint licenses, and relied on Plaintiff for technical support. ECF No. 6 at PageID.16.

With a purchased license, an end user could download the NearPoint software onto their computer. *Id.*; *see also* ECF No. 6-8 at PageID.79. But before they could install, activate, and use NearPoint, Plaintiff alleges that end-users—such as MyMichigan employees—were required to agree to its End User License Agreement (EULA), which was expressly governed by New York law. ECF Nos. 6 at PageID.16; 6-8 at PageID.82 ("Except to the extent that this Agreement is governed by the laws of the United States, this Agreement . . . shall be governed by the laws of the State of New York.").

Plaintiff alleges that NearPoint licenses were email account specific, such that an end user, in theory, needed two separate NearPoint licenses to archive two separate email accounts. ECF

No. 6 at PageID.14–15. But, practically, Plaintiff alleges that end users who already purchased a license, installed NearPoint, and agreed to the EULA, could "again install and activate the NearPoint software for use on additional mailboxes at any time by following the original installation process[.]" *Id.* at PageID.17. Thus, Plaintiff alleges, the only way it knew if an end-user exceeded their authorized use of NearPoint was through audits, as contemplated in the EULAs. *Id.* at PageID.16–17; ECF No. 6-8 at PageID.80 ("Capax[1] may audit Licensee compliance with the Software license terms. Upon reasonable notice, Capax may conduct an audit during normal business hours[.]"). If an audit revealed the end user was exceeding their authorized use of NearPoint, the EULAs authorized Plaintiff to recover underpayments. ECF Nos. 6 at PageID.16–17; 6-8 at PageID.80.

In April 2019, Defendants purchased an additional 323 NearPoint licenses from Plaintiff—bringing their total to 7,473 licenses—but did not renew their support services contract. ECF No. 6 at PageID.19. Two years later, Defendants allegedly responded to Plaintiff's audit inquiries that they were using NearPoint software on 12,930 email accounts. *Id.* Accordingly, as each NearPoint license cost $40, Plaintiff requested $218,280 from Defendants to compensate for the 5,457 email accounts using NearPoint without a purchased license. *Id.* Defendants did not pay. *Id.*

In September 2022, Plaintiff sued Defendants in New York state court. ECF No. 1-1. Two months later, Defendants removed the case to the United States District Court for the Southern District of New York. *See* ECF No. 3; 22-cv-09395 ECF No. 1. In April 2023, the Parties stipulated to transfer the case to this Court, for the convenience of the Parties and in the interests of justice. *See* ECF No. 3; 22-cv-09395 ECF No. 38; *see also* 28 U.S.C. § 1404(a). Once transferred, Plaintiff

---

[1] Plaintiff was formerly known as Capax Discovery, LLC. ECF No. 6 at PageID.11.

filed an Amended Complaint alleging breach of contract (Count I) and unjust enrichment (Count II). ECF No. 6.

Defendants filed a Motion to Dismiss in June 2023. ECF No. 10. Defendants argue Plaintiff did not state a valid breach of contract claim because (1) Plaintiff did not show that the EULAs are enforceable contracts, *id.* at PageID.111–15; (2) even if the EULAs are enforceable, Plaintiff did not plausibly allege a breach, *id.* at PageID.115–16; and (3) a four-year statute of limitations bars Plaintiff's claim as untimely. *Id.* at PageID.116–18. Defendants argue Plaintiff fails to state a valid unjust enrichment claim because Plaintiff alleges the Parties' relationship was governed by a valid contract and, regardless, did not allege that Plaintiff provided anything of value to Defendants. *Id.* at PageID.120–24.

Defendants' Motion to Dismiss was referred to Magistrate Judge Patricia T. Morris, ECF No. 14, who issued a report (R&R) recommending this Court grant the motion in part, dismissing only Plaintiff's breach of contract claim. ECF No. 20.

Judge Morris concluded that Plaintiff's breach of contract claim "must fail on its face" because Plaintiff has not shown Defendants breached any provision of any contract. *Id.* at PageID.922. Plaintiff alleges that Defendants breached the EULAs by using NearPoint for 12,930 email inboxes when it only had 7,473 licenses. ECF No. 6 at PageID.21. But Judge Morris found nothing in any purported contract, including the attached EULA, that corroborated Plaintiff's claim that a license only authorized NearPoint use on one email account. ECF No. 20 at PageID.922. So, even assuming the EULAs—which were unsigned by both Parties and only allegedly agreed to by Defendants' employees—were valid contracts, Judge Morris concluded that Plaintiff had not plausibly pleaded a breach. *Id.* at PageID.922–23 (noting "there are no citations to any document,

let alone the EULA, that supports" Plaintiff's allegation that "one NearPoint license is equivalent to one archived email mailbox").

Turning to the unjust enrichment claim, Judge Morris rejected Defendants' argument that Plaintiff cannot *plead* both unjust enrichment and breach of contract, although Judge Morris noted that Plaintiff cannot simultaneously *recover* on both claims. *Id.* at PageID.924 (noting "a plaintiff is entitled to plead an unjust enrichment claim in the event its breach of contract claim fails" and collecting cases). Judge Morris then concluded that Plaintiff properly pleaded unjust enrichment under both Michigan and New York law—which are "virtually the same"—because the Complaint alleged Defendants knew that Plaintiff had the exclusive right to license NearPoint but benefited from the unauthorized use of thousands of NearPoint-archived accounts, without compensating Plaintiff for this benefit. *Id.* at PageID.925 (citing ECF No. 6 at PageID.22–23).

Plaintiff objected to the R&R on January 14, 2024. ECF No. 21. Defendants did not object, but responded to Plaintiff's Objections on February 1, 2024. ECF No. 22.

## II.

### A.

Under Civil Rule 72, a party may object to and seek review of a magistrate judge's report and recommendation. *See* FED. R. CIV. P. 72(b)(2). The parties must state any objections with specificity within a reasonable time. *Thomas v. Arn*, 474 U.S. 140, 151 (1985) (citation omitted). Any objection which fails to identify specific portions of the R&R will not be reviewed. *See Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) ("A general objection to the entirety of the magistrate's report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review[.]"). "An 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply

summarizes what has been presented before," is not a proper objection. *Aldrich v. Bock*, 327 F. Supp. 2d 743, 747 (E.D. Mich. 2004). Further, parties cannot "raise at the district court stage new arguments or issues that were not presented" before the R&R was issued. *See Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000).

If a party makes a timely and proper objection, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." FED. R. CIV. P. 72(b)(3). When reviewing a report and recommendation *de novo*, this Court must review at least the evidence that was before the magistrate judge. *See Hill v. Duriron Co.*, 656 F.2d 1208, 1215 (6th Cir. 1981). After reviewing the evidence, this Court is free to accept, reject, or modify the Magistrate Judge's findings or recommendations. FED. R. CIV. P. 72(b)(3); *Peek v. Comm'r of Soc. Sec.*, No. 1:20-CV-11290, 2021 WL 4145771, at *2 (E.D. Mich. Sept. 13, 2021).

**B.**

Under Civil Rule 12(b)(6), a pleading fails to state a claim if it does not contain allegations that support recovery under any recognizable theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a Rule 12(b)(6) dismissal, the court must accept all factual allegations of the complaint as true and will construe the pleading in favor of the nonmovant. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The plaintiff need not provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," but the court need not accept as true the complaint's legal conclusions. *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted).

### III.

Plaintiff's sole objection to the R&R asserts it plausibly pleaded that Defendants' breached the EULAs. ECF No. 21 at PageID.934. Notably, Plaintiff's operative Complaint alleged Defendants breached the EULAs by (1) *using* NearPoint to archive 12,930 email accounts when they only purchased 7,473 licenses; (2) *failing to notify* Plaintiff of this alleged unauthorized use; and (3) *refusing to pay* for the 5,457 licenses. ECF No. 6 at PageID.21. But all these alleged breaches hinge on whether, in fact, one NearPoint license limited NearPoint's use to only one email account or inbox. On this point, Plaintiff alleged in paragraphs 14 and 15 of its Complaint, without citing any contract in support:

> A NearPoint software license is required for each user mailbox for which the NearPoint software product was used to archive an email mailbox and data, as well as each user mailbox actively using NearPoint to archive email data. An end user is prohibited from using one NearPoint license to fully archive an email mailbox, and then use the same NearPoint license[] to archive another email mailbox. That would require two NearPoint licenses. In other words, one NearPoint licenses is equivalent to one archived email mailbox whether the email mailbox was actively archiving new data or not.
>
> MyMichigan knew and understood that a NearPoint license was required for each mailbox that used or is using the software, regardless of whether the archived mailbox was active.

*Id.* at PageID.14–15. The problem, from Judge Morris's perspective, was that nothing in the EULA attached to Plaintiff's Complaint corroborated these allegations. ECF No. 20 at PageID.922. In its Objection, Plaintiff identifies three specific provisions of the EULA it contends provide textual support for these allegations, suggesting that one license is required for only one email account:[2]

---

[2] Defendants argue this Objection is improper because it asserts new arguments. ECF No. 22 at PageID.951–52; *see also Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000). Not so. Defendants themselves argued that Plaintiff's complaint should be dismissed because Plaintiff could not connect Defendants' alleged conduct to any specific EULA provision, ECF No. 10 at PageID.93; and Judge Morris expressly considered the EULA in its entirety when analyzing this argument. ECF No. 20 at PageID.922. Plaintiff's objection, therefore, emphasizes the three provisions of the EULA that, in Plaintiff's view, Judge Morris overlooked.

> (1) Plaintiff granted "limited, non-exclusive, non-transferable license[s]" to Defendants only upon "the full and timely payment of the licensing fees" ECF No. 6-8 at PageID.79.
> (2) Plaintiff "may audit [Defendants'] compliance with the Software license terms" and, if "an audit reveals underpayments then [Defendants] will pay to [Plaintiff] such underpayments." *Id.* at PageID.80
> (3) Defendants "may make a copy or adaptation of a licensed Software product only for archival purposes when it is an essential step in the authorized use of the Software. [Defendants] may use this archival copy without paying an additional license only when the primary system is inoperable." *Id.*

ECF No. 21 at PageID.938. But this Court, reviewing the record *de novo*, identifies a fourth, more on-point provision. The very first section of the EULA attached to Plaintiff's Complaint states:

> The use of Software is *limited* to *only* as many computers, devices, number or users, and/or in such configurations or other restrictions as expressly permitted by [Plaintiff] as set forth in the applicable [Product Order Form].

ECF No. 6-8 at PageID.79. Plaintiff attached three product order forms (POFs) to its Complaint, which were sent to Defendants in the form of invoices. *See* ECF Nos. 6-5; 6-6; 6-7. The first POF, in September 2014, expressly references Defendants' purchase of 1,500 "additional *mbox licenses*." ECF No. 6-5 at PageID.73 (emphasis added). In a light most favorable to Plaintiff, this plausibly infers that NearPoint licenses were limited to only one email inbox or account. And although this POF use-limitation is connected to the EULAs by the most modest of threads, a modest thread is all that is necessary, at this stage, to render Plaintiff's three alleged breaches plausible.

On this point, the Parties' course of dealing corroborates Plaintiff's claims and further suggests that the limits on authorized NearPoint use, set in the POFs and cross-referenced in the EULAs, had teeth. Defendants allegedly purchased *thousands* of NearPoint licenses from Plaintiff, across at least three bulk transactions, after having already owned 4,000 licenses. *See* ECF Nos. 6 at PageID.13; 6-5 (purchasing 1,500 licenses in September 2014); 6-6 (purchasing an additional 1,000 licenses in October 2017); 6-7 (purchasing an additional 650 licenses in March 2018).

Further, Plaintiff alleges that Defendants requested an additional 323 licenses in March 2019 as a "true-up," suggesting Defendants needed an additional 323 licenses to conform to their authorized use. *See id.* at PageID.18.

In sum, Plaintiff has plausibly alleged that one NearPoint license authorized the software's use on only one email inbox, thus plausibly alleging that Defendants breached the EULA. Plaintiff's objection will be sustained and the R&R will be overruled to the extent it reached an opposite conclusion.

But finding a plausible breach is only a half-measure. Indeed, as Defendants argue, if the EULA is not a valid contract, the "breach" of a specific provision is not actionable. ECF No. 10 at PageID.111–15; *see also Bank of Am., N.A. v. First Am. Title Ins. Co.*, 878 N.W.2d 816, 829 (Mich. 2016) (requiring a valid contract for breach of contract claim under Michigan law); *34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. Ct. App. 2022) (same, under New York law). Likewise, if Plaintiff has plausibly alleged both the EULA's validity and a breach, Plaintiff's breach of contract claim may be barred by the applicable statute of limitations. Judge Morris did not reach these two issues, *see* ECF No. 20 at PageID.927 n. i, so both will be discussed in turn.

### A.

Defendant argues that the EULA attached to Plaintiff's complaint does not evidence a valid contract between the Parties because it was unsigned by either Party. ECF No. 10 at PageID.111–14. Plaintiff responded that the EULAs were "clickwrap agreements" which became enforceable each time Defendants installed NearPoint onto a new computer or account because Defendants were required to read and click "I agree" to the EULAs before installing or using the software.[3]

---

[3] In response to Defendants' Motion to Dismiss, Plaintiff attaches and cites the declaration of its COO, Michael McGrath, who further explained that licensees must "scroll[] through" the EULA and then affirmatively click "I agree" before installing and using NearPoint. ECF No. 18-2 at PageID.725–27. Plaintiff argues that, despite falling outside the four-corners of the Complaint,

Under Michigan law, a valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *Tariq v. Tenet Healthcare Corp.*, No. 356904, 2022 WL 880629, at *4 (Mich. Ct. App. Mar. 24, 2022) (citing *Innovation Ventures v Liquid Mfg,*, 885 NW2d 861, 871 (Mich. 2016). Similarly, under New York law, [4] a valid contract requires an offer, acceptance, consideration, mutual assent, and an intent to be bound. *Kasowitz, Benson, Torres & Friedman, LLP v. Reade*, 98 A.D.3d 403, 404 (N.Y. App. Div. 2012), *aff'd*, 987 N.E.2d 631 (N.Y. Ct. App. 2013) (citing 22 N.Y. Jur. 2d, Contracts § 9). But agreement and assent often become hazy in the software setting, when parties communicate on a computer.

"Clickwrap" agreements commonly accompany software installations. Monique C.M. Leahy, *Litigation of Internet "Wrap" Agreements*, 150 AM. JUR. TRIALS 383 § 4 (2017) (updated Feb. 2024). In the textbook case, when a user attempts to install or use software for the first time, an agreement will pop-up on the user's computer screen, requiring the user to read the terms and affirmatively "click" "I agree," or otherwise manifest their assent to the pop-up agreement. *See id.*

---

this declaration can properly be considered at this motion-to-dismiss stage because it is "integral" to Plaintiff's Complaint. ECF No. 18 at PageID.705 n. 2. But, despite its relevancy, McGrath's declaration was not referred to in Plaintiff's Complaint. *See* ECF No. 6. *See McLaughlin v. CNX Gas Co.,* LLC, 639 F. App'x 296, 298 (6th Cir. 2016) (noting, under Rule 10(c), additional documents may be considered at the motion-to-dismiss stage without converting the motion to one for summary judgment *only* when the document is "referred to in the plaintiff's complaint *and* [is] central to her claims" (internal quotations omitted)). So, to avoid converting Defendants' motion to one for summary judgment, this Court will not consider McGrath's declaration. That said, McGrath's declaration adds little to what Plaintiff pleaded in its Complaint, which alleged "[i]n order for a third-party licensee to install, activate, and use the licensed NearPoint software on an email mailbox, the third-party was required to agree to [the EULA] to complete the software installation and activation." ECF No. 6 at PageID.16.

[4] Recall the EULAs contain a choice-of-law provision purporting to subject the Parties to New York law. ECF No. 6-8 at PageID.82. Defendants concede that, if the EULA is enforceable, it is governed by New York law. ECF No. 10 at PageID.110. This Court will analyze both Michigan and New York law to determine whether Plaintiff has plausibly pleaded the EULA's validity in the first instance.

Although conventional wisdom and empirical evidence reveal "that users do not actually read web agreements before clicking 'I agree,' or otherwise indicating their acceptance of the terms of these contracts," "courts have generally held that clicking 'I agree,' or whatever the agreement provides as a manifestation of assent, *is sufficient formation of a contract*, regardless of whether the user actually read the . . . agreement." Daniel D. Haun & Eric P. Robinson, *Do You Agree?: The Psychology and Legalities of Assent to Clickwrap Agreements*, 28 RICH. J.L. & TECH. 623, 625 (2022); see also Nathan J. Davis, *Presumed Assent: The Judicial Acceptance of Clickwrap*, 22 Berkeley Tech. L.J. 577, 579 (2007) (noting courts "have unanimously found that clicking is a valid way to manifest assent since the first clickwrap agreement was litigated in 1988").

Under New York law, clickwrap agreements are enforceable so long as the consumer has a sufficient opportunity to read the agreement and the method of accepting or declining it is unambiguous. *Serrano v. Cablevision Sys. Corp.*, 863 F. Supp. 2d 157, 164 (E.D.N.Y. 2012) (citing *Moore v. Microsoft Corp.*, 293 A.D.2d 587, 588 (N.Y. App. Div. 2002) (contract formed when "[t]he terms of the [agreement] were prominently displayed on the program user's computer screen before the software could be installed," and "the program's user was required to indicate assent to the [agreement] by clicking on the 'I agree' icon before proceeding with the download")). And although Michigan has less precedent on clickwrap agreements, the Michigan Court of Appeals has enforced them so long as the individual had the opportunity to view the agreement and manifest their assent in some form. *See Tariq v. Tenet Healthcare Corp.*, No. 356904, 2022 WL 880629, at *2 (Mich. Ct. App. Mar. 24, 2022) (finding arbitration agreement valid and enforceable when plaintiff clicked "I agree" after the agreement "popped up" on plaintiff's computer screen at the conclusion of a training video).

Here, Plaintiff attached a "true and correct copy" of the EULA to its Complaint. ECF No. 6 at PageID.16 (citing ECF No. 6-8). Plaintiff alleged Defendants were "required" to agree to the EULA's terms, after receiving the NearPoint software "via electronic download," before Defendants could "complete the software installation and activation" *Id.* The attached EULA specifically instructed Defendants—and all users—to "READ CAREFULLY" and that its terms would apply if the user proceeded to install or use NearPoint. ECF No. 6-8 at PageID.79. Notably, Plaintiff also alleges—based on a report provided by Defendants—that Defendants, in fact, installed and used NearPoint on over 12,000 email inboxes. ECF No. 6 at PageID.19. This fact, assumed true on Rule 12(b)(6) review, plausibly suggests Defendants manifested their assent to the EULA's terms over 12,000 times. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). So, construed in the light most favorable to Plaintiff, the Complaint plausibly alleged that the EULA was an enforceable agreement between the Parties. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

**B.**

Having concluded Plaintiff plausibly alleged the EULA's validity and Defendants' breach, the next issue is whether Plaintiff's breach of contract claim is otherwise barred by the applicable statute of limitations. Because the record does not reflect when Defendants' first allegedly unauthorized NearPoint use occurred, Plaintiff's breach of contract claim will not be dismissed for untimeliness at this stage.

Under New York law—which Defendants concede governs the EULA if it is found valid, ECF No. 10 at PageID.110 n.3—"[b]reach of contract actions are generally subject to a six-year statute of limitations. *Chase Sci. Rsch., Inc. v. NIA Grp., Inc.*, 749 N.E.2d 161, 163 (N.Y. Ct. App. 2001). However, New York law expressly excludes from this six-year statute of limitations breach

of contract claims involving the sale of goods—defined as all things movable at the time of contract—subject to Article 2 of the Uniform Commercial Code and its four-year statute of limitations. *See* N.Y. C.P.L.R. § 213(2); UNIF. COM. CODE §§ 2-105(1) and 2-725. The Parties spill significant ink arguing whether the EULA is a contract for *goods* or *services* and which statute of limitations apply. ECF Nos. 10 at PageID.116–18; 18 at PageID.707–715. But even if the shorter, four-year statute of limitations applies,[5] Defendants have not shown that Plaintiff's claim is untimely.

A breach of contract cause of action accrues upon the time of the alleged breach. *6D Farm Corp. v. Carr*, 882 N.Y.S.2d 198, 201 (N.Y. Ct. App. 2009). Plaintiff alleges it first *believed* Defendants were exceeding their authorized NearPoint use in March 2019, because Defendants requested a "true-up" purchase of 323 additional NearPoint licenses. ECF No. 6 at PageID.18. And Plaintiff alleges it first *learned* of Defendants' unauthorized NearPoint use in April 2021, when Defendants reported NearPoint was being used for 12,930 email accounts. *Id.* at PageID.19. But discovery is necessary to know the exact date of Defendants' first allegedly unauthorized

---

[5] This Court notes that New York's general *six* year statute of limitations likely applies to Plaintiff's breach of contract claim because the EULAs are best classified as services contracts. For "mixed" contracts such as the EULA—which plausibly contemplate both goods and services—courts apply the "predominant purpose test" and assess whether the transaction is "predominantly one for goods or one for services." *Hagman v. Swenson*, 47 N.Y.S.3d 324, 325 (N.Y. Ct. App. 2017). Here, although New York courts have recognized that software itself is generally considered a tangible and movable item, generally "qualif[ying] as a 'good' under Article 2 of the UCC," *Commc'ns Groups, Inc. v. Warner Commc'ns, Inc.*, 527 N.Y.S.2d 341, 344 (N.Y. Civ. Ct. 1988), the purpose of the EULAs was to govern NearPoint's *use*, not its *exchange*. Defendants' purchases of NearPoint from Plaintiff were reflected in various POFs, not the EULAs. *Compare* ECF Nos. 6-5; 6-6; 6-7 *with* ECF No. 6-8. Individual users agreed to the EULAs just before completing installation on their computers only *after* Defendants and Plaintiff executed the over-arching POFs. The EULAs expressly stated "[n]o title to or ownership of [NearPoint] is transferred to Licensee. [Plaintiff] and its licensors own and retain all title and ownership of all intellectual property rights[.]" ECF No. 6-8 at PageID.79.

NearPoint use. Thus, dismissing on timeliness grounds is premature.[6] ECF No. 18 at PageID.712. *Century Tower Assocs. NY LLC v. Feld, Kaminetzky & Cohen*, 214 A.D.3d 434, 434 (N.Y. App. Div. 2023) (denying motion to dismiss for untimeliness when movants "failed to eliminate issues of fact as to when the claims against it accrued"); *Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.*, 76 A.D.2d 68, 80 (N.Y. App. Div.1980) (affirming denial of motion to dismiss on timeliness grounds when "triable issue of fact exists with respect to accrual of a claim").

Defendants' argument to the contrary is without merit. Defendants argue, applying a four-year statute of limitations, that Plaintiff's claim is time barred because the dates Plaintiff alleges it first believed Defendants breached the EULAs are nothing more than "revisionist history[.]" ECF No. 10 at PageID.118. Defendants point to *prior*, *non-operative* complaints filed in *other courts* in which Plaintiff alleged it learned of Defendants' breach "in 2018" generally. *Id.* In other words, Defendants do not argue that the dates, as pleaded in Plaintiff's Complaint, bar Plaintiff's breach of contract claim. Instead, Defendants argue these dates—factual allegations within Plaintiff's complaint—are *untrue* and Plaintiff actually learned of an alleged breach earlier in 2018. *See id.* But this Court must accept as true Plaintiff's factual allegations at this stage. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). And this argument only reinforces the need for additional

---

[6] Plaintiff filed its state court complaint—which was removed to the Southern District of New York and then transferred to this Court—on September 21, 2022, ECF No. 1-1. Thus, unless tolled, Plaintiff's claim would be barred as untimely if discovery reveals the alleged breach occurred before September 21, 2018, if the four-year statute of limitations applies. If the six-year statute of limitations applies, unless tolled, Plaintiff's claim would be barred as untimely if discovery reveals the alleged breach occurred before September 21, 2016. Notably, Plaintiff alleges the continuing-wrong doctrine applies to Defendants' conduct because the EULA imposes a continuing obligation on the Parties and, thus, the applicable statute of limitations would be tolled until the date of the *last* breach. ECF No. 18 at PageID.713–15; *see also Affordable Hous. Assocs., Inc. v. Town of Brookhaven*, 49 Misc. 3d 570, 573, 13 N.Y.S.3d 876, 879 (N.Y. Sup. Ct. 2015), aff'd, 150 A.D.3d 800, 54 N.Y.S.3d 122 (2017); *Garron v. Bristol House, Inc*., 162 A.D.3d 857, 858–59 (N.Y. App. Div. 2018). But, even if this doctrine applies, discovery is needed to determine whether Defendants continue to use NearPoint and, if not, when their last allegedly unauthorized use occurred.

discovery on this issue. Indeed, the relevant metric for claim accrual is not when Plaintiff first learned of an alleged breach but when the alleged breach, in fact, occurred. *6D Farm Corp. v. Carr*, 882 N.Y.S.2d 198, 201 (N.Y. Ct. App. 2009). Even if discovery reveals that Plaintiff first believed Defendants breached the EULAs in early 2018, the record is still silent on when Defendants first allegedly authorized NearPoint use actually occurred.

In sum, Plaintiff's objection will be sustained and the R&R will be overruled to the extent it recommended dismissal of Plaintiff's breach of contract claim. Plaintiff has plausibly alleged that the EULAs are a valid contract between Plaintiff and Defendants and that Defendants breached that contract by exceeding their authorized NearPoint use. Because questions of fact exist regarding when Defendants' first unauthorized use occurred, Plaintiff's breach of contract claim will not be dismissed as untimely at this stage.

**IV.**

Accordingly, it is **ORDERED** that Plaintiff's Objection, ECF No. 21, is **SUSTAINED**.

Further, it is **ORDERED** that the Magistrate Judge's Report and Recommendation, ECF No. 20, is **OVVERRULED IN PART**, to the extent it concluded Plaintiff did not plausibly plead a specific breach of the End User Licensing Agreement and recommended dismissal of Plaintiff's breach of contract claim.

Further, it is **ORDERED** that the Magistrate Judge's Report and Recommendation, ECF No. 20, is **ADOPTED IN PART**, in all other respects.

Further, it is **ORDERED** that Defendants' Motion to Dismiss, ECF No. 10, is **DENIED.**

Dated: March 26, 2024          s/Thomas L. Ludington
                               THOMAS L. LUDINGTON
                               United States District Judge