**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

ZANTAZ ENTERPISE ARCHIVE SOLUTIONS, LLC f/k/a CAPAX DISCOVERY, LLC

Plaintiff,

v.

Case No. 1:23-CV-10932
District Judge Michael C. Martin

MIDMICHIGAN HEALTH and MID-MICHIGAN HEALTH SYSTEMS, INC.

Defendant.
_________________________________/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before this Court on cross motions for summary judgment on Plaintiff's breach of contract and unjust enrichment claims. For the reasons explained below, the Court will deny both.

## I. BACKGROUND

Plaintiff Zantaz Enterprise Archive Solutions, LLC ("Zantaz") is a limited liability company organized under New York law, with its principal place of business in Erie County, New York. (ECF No. 6.) Zantaz owns and possesses the right to license various software products related to data archiving, management

storage, protection, exportation, and migration. (*Id.*) Defendants MidMichigan Health and Mid-Michigan Health Care Systems, Inc. (collectively "MyMichigan") are non-profit companies organized under Michigan law, with their principal place of business in Midland, Michigan. (ECF No. 10.) MyMichigan provides healthcare services throughout twenty-five counties in Michigan. (ECF No. 23, PageID.978.)

This case involves "NearPoint," a type of software used to archive emails. (*Id.*) According to Zantaz, end users, including MyMichigan, could download and install NearPoint onto individual email accounts after obtaining a license. (ECF No. 37.) Before NearPoint would install, however, end users such as MyMichigan were required to scroll through the End User License Agreement's ("EULA") terms and click "I agree" to the EULA's "clickwrap agreement." (*Id.*) The EULA is governed by New York law and pursuant to its terms:

(1) Zantaz granted "limited, non-exclusive, non-transferrable license[s]" to MyMichigan, upon "the full and timely payment of the licensing fees." (ECF No. 37-3.)

(2) Zantaz "may audit [MyMichgan's] compliance with the software license terms," and, if "an audit reveals underpayments then [MyMichigan] will pay to [Zantaz] such underpayments." (*Id.*)

(3) MyMichigan "may make a copy or adaptation of a licensed Software product only for archival purposes when it is an essential step in the authorized use of the Software. [MyMichigan] may use this archival copy without paying an additional license only when the primary system is inoperable." (*Id.*)

(4) The use of Software is *limited to only* as many computers, devices, numbers, or users, and/or in such configurations or other restrictions as

> expressly permitted by [Zantaz] in the applicable [Product Order Form].” (*Id.*) (emphasis added).

MyMichigan began using NearPoint in 2011, when the software was owned by Autonomy Inc. (“Autonomy”), a non-party. (ECF No. 37, PageID.1067.) In April 2014, MyMichigan entered into a software support and maintenance agreement with Zantaz, then known as Capex Discovery, LLC, where Zantaz would provide support and maintenance for NearPoint licenses that MyMichigan already possessed. (ECF No. 23, PageID.978–79.)

In July 2014, Zantaz acquired the exclusive right to license NearPoint from Autonomy, as well as the rights and obligations associated with MyMichigan’s existing NearPoint licenses and support contracts. (ECF No. 37, PageID.1068; ECF No. 38, PageID.1350.)

In September 2014, MyMichigan purchased 1,500 NearPoint licenses and technical support services from Zantaz. (ECF No. 37, PageID.1068.) Zantaz’s invoice to MyMichigan stated that the licenses were for “[a]dditional mailbox[es]…for M/S Exchange.” (ECF No. 38-3.) The following month, MyMichigan purchased another 1,000 licenses and corresponding support services. (ECF No. 37, PageID.1080.)

In March 2016, MyMichigan’s acting Information Technology Manager, Kim Mau, learned from Zantaz’s support vendor that Zantaz counted “inactive users” toward MyMichigan’s NearPoint license requirement. (ECF No. 8-4,

PageID.1377.) Mau subsequently requested that MyMichigan be moved into an "active user" model, whereby MyMichigan would only be required to have NearPoint licenses for their "active users." (ECF No. 38-4, PageID.1377.) Zantaz employee Tim Walz, agreed to Mau's request, and Zantaz issued a quote to MyMichigan stating that its next purchase of NearPoint licenses would "bring [MyMichigan's] account into compliance with the EULA" and that "[o]nly 'active' mailboxes will be counted toward the MCL (mailbox count limit)." (ECF No. 38-5, PageID.1377–78.) MyMichigan then submitted a purchase order to Zantaz reflecting those terms. (ECF No. 38-6, PageID.1380.)

In October 2017, Zantaz sent MyMichigan an invoice for their purchase of "1,000 additional licenses." (ECF No. 37-9.) In March 2018, Zantaz sent MyMichigan an invoice for 650 NearPoint licenses. (ECF No. 37-10.)

In April 2018, Mau emailed Casey Hansen, Zantaz's acting Director of Sales, requesting a written agreement from Zantaz reflecting MyMichigan's "active user" model. (ECF No. 38-7, PageID.1383.) Hansen initially responded that a new agreement was unnecessary because the parties' current documentation was sufficient for future licensing agreements and that Zantaz would not require "true ups based on inactive users." (*Id.* at PageID.1381.) Mau nevertheless requested a written contract to "protect both parties." (*Id.*) In May 2018, Hansen emailed Mau a new unsigned license agreement (the "2016 License Agreement"),

which stated that the agreement would not be binding until signed by both parties. (ECF No. 38-8, PageID.1386.) The pertinent terms of the 2016 License Agreement include:

(1) "In addition to the provisions and limitations set forth in the Prior Agreement," Zantaz "grants [MyMichigan] limited, non-exclusive, non-transferrable license[s]." (*Id.*)

(2) "This agreement supersedes any previous online agreement also known as a click through agreement that was previously accepted." (*Id.*)

(3) "Notwithstanding anything to the contrary set forth in this Agreement, the terms of the Prior Agreement continue in full force and effect[,]" and "[t]his agreement does not supersede the terms of the Prior Agreement for any purpose[.]" (*Id.* at PageID.1387.)

(4) The "[d]efinition 'Archived Users(s)' [] will from execution of this agreement [] be modified as '(i) Individual users' will now be '(i) Individual Active users.'" (*Id.*)

(5) "This Agreement constitutes the entire agreement between the parties" and "supersedes all prior oral or written offers, negotiations, discussions, or other communications." (*Id.* at PageID.1390.)

In November 2018, Tony Guzzo, a Zantaz Account Manager, sent Joshua Church and Johnathan May of MyMichigan a quote to correct what Zantaz believed was a NearPoint license overage by MyMichigan. (ECF No. 37-12.) Guzzo stated that MyMichigan was currently using 10,680 licenses, but had purchased only 7,150. (*Id.*) Guzzo offered to waive the "true up" fee for the additional licenses if MyMichigan agreed to transition to Zantaz's new email archiving software. (*Id.*) During the email exchange, May asked Guzzo whether a

NearPoint license was required for every individual mailbox. (*Id.*) Guzzo confirmed that "[one] [NearPoint] license equates to [one] user['s] mailbox." (*Id.*)

In March 2019, the parties sought to confirm the number of active and inactive email mailboxes archived by NearPoint before MyMichigan's maintenance and support agreement expired. (ECF No. 38, PageID.1352.) Both parties confirmed that MyMichigan had 7,473 active mailboxes being archived by NearPoint. (ECF No. 38-11, PageID.1396.) Zantaz subsequently issued a quote for an additional 323 NearPoint licenses, which MyMichgan purchased. (ECF No. 37, PageID.1069; ECF No. 38, PageID.1352.) In April 2019, MyMichigan informed Zantaz that they would not renew their maintenance and support agreement and would begin transitioning away from NearPoint. (ECF No. 1352.)

In January 2021, approximately two years after MyMichigan transitioned away from NearPoint, Zantaz sent MyMichigan a letter asserting that MyMichigan was using 11,832 NearPoint licenses despite having purchased only 7,473. (ECF No. 38-15, PageID.1422.) Zantaz invoked its audit rights under the EULA, and MyMichigan provided a chain-of-custody report. (*Id.*) Zantaz contends that the report showed that MyMichigan used NearPoint on 12,930 email mailboxes, meaning that MyMichigan used NearPoint on 5,547 mailboxes for which they had not purchased licenses. (ECF No. 37, PageID.1069; ECF No. 38, PageID.1354.) At

$40 per license, Zantaz demanded $218,280. (ECF No. 23, PageID.980; ECF No. 37, PageID.1082.) MyMichigan refused to pay. (ECF No. 38, PageID.1354.)

Zantaz filed this action in New York state court, but MyMichigan removed it to the Southern District of New York. (ECF No. 1.) The parties stipulated to transfer the case to this Court (ECF No. 3), and Zantaz thereafter filed its operative second amended complaint, asserting a state law breach of contract claim and an unjust enrichment claim. (ECF No. 6.) MyMichigan moved to dismiss Zantaz's amended complaint, arguing that Zantaz had not adequately alleged an enforceable EULA, that MyMichigan had not breached the EULA, and that the breach of contract claim was barred by the statute of limitations. MyMichigan also argued that the unjust enrichment claim failed because the parties' relationship was governed by a valid contract. (ECF No. 10, PageID.111–18.)

The Court referred the motion to Magistrate Judge Patricia T. Morris, who issued a Report and Recommendation ("R&R") recommending dismissal of Zantaz's breach of contract claim. (ECF No. 20.) Zantaz objected to the R&R and MyMichigan responded. (ECF Nos. 21, 22.) After reviewing the R&R *de novo*, the Court sustained Zantaz's objection to the R&R, overruled the R&R to the extent it recommended dismissal of the breach of contract claim, and denied MyMichigan's motion to dismiss. (ECF No. 23.) The Court concluded that Zantaz had plausibly alleged that the EULA was an enforceable contract, and that MyMichigan

plausibly breached the EULA based on MyMichgan's alleged use of NearPoint beyond the scope of its authorized licenses. (*Id.*) The Court also declined to dismiss Zantaz's breach of contract claim as untimely because the record did not establish when MyMichigan's alleged unauthorized use occurred. (*Id.*)

Following discovery, both parties moved for summary judgment. (ECF Nos. 37, 38.) Zantaz seeks partial summary judgment, as to liability only, on its claims against MyMichigan for breach of contract, or, alternatively, for unjust enrichment. (ECF No. 38.) MyMichigan seeks summary judgment on both Zantaz's breach of contract and unjust enrichment claims. (ECF No. 38.) Both parties filed responses and replies. (ECF Nos. 40, 41, 43, 44.)

## II. ANALYSIS

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law. *Villegas v. Metro Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is considered material only if the fact might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute of material facts is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). To show that a fact is, or is not, genuinely disputed, both parties are required to either "cite[] to particular parts of the materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering cross motions for summary judgment, a court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003) (citation omitted). When evaluating cross motions for summary judgment, courts are not necessarily required to find that one party wins and the other party loses. *See Parks v. LaFace Recs.*, 329 F.3d 437, 444–45 (6th Cir. 2003).

**A. Breach of Contract**

Zantaz argues that it is entitled to partial summary judgment for its breach of contract claim because MyMichigan assented to the terms of the EULA thousands of times through "clickwrap agreements," and the EULA's terms clearly state that MyMichigan was required to purchase a NearPoint license for each email mailbox utilizing NearPoint software. Moreover, Zantaz claims that the 2016 License Agreement is not a valid enforceable contract because the parties never mutually assented to its terms.

MyMichigan, in contrast, argues that it is entitled to summary judgment on Zantaz's breach of contract claim for two reasons. First, MyMichigan contends that they never agreed to the EULA, and therefore, are not bound by its terms. Second, MyMichigan asserts that the 2016 License Agreement is a valid enforceable contract between the parties, and therefore, MyMichigan was only required to possess NearPoint licenses for its "active users."

**1. The EULA**

The Court will analyze New York law to determine both the EULA's and the 2016 License Agreement's validity because both agreements contain a choice of law provision stating that the terms of the contract are governed by New York law. (ECF No. 37-3, PageID.1109; ECF No. 38-8, PageID.1390.) Moreover, MyMichigan previously conceded that, if the EULA is enforceable, it is governed by New York law. (ECF No. 10, PageID.110.)

Under New York law, a valid contract requires an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound. *Kasowitz, Bensen, Torres & Friedman, LLP v. Duane Reade*, 98 A.D.3d 403, 404 (N.Y. App. Div. 2012), *aff'd*, 987 N.E.2d 631 (N.Y. Ct. App. 2013) (citing 22 N.Y. Jur. 2d, Contracts § 9). "Clickwrap agreements" are an increasingly common type of web-based contract. *Fteja v. Facebook, Inc.*, 841 F. Supp. 3d 829, 837 (S.D.N.Y. 2012). Clickwrap agreements present the software's user with the terms and conditions of

the contract and require the user to click an "I agree" box before using the software. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (first citing *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016); and then citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014)). "Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of the agreement by clicking 'I agree.'" *Fteja*, 841 F. Supp. 3d at 837. However, to be enforceable, the clickwrap agreement must provide the user with "reasonably conspicuous notice that" the user was "about to bind themselves to [the] contract['s] terms. *Specht v. Netscape Commc'ns Corp.*, 306, F.3d 17, 32 (2d Cir. 2002).

The parties dispute whether the EULA was presented in the form of a clickwrap agreement, and therefore, whether "reasonably conspicuous notice" was provided. *See Specht*, 306 F.3d at 32. Zantaz's contention that the EULA was a binding clickwrap agreement rests primarily on the declaration of Michael McGrath, Zantaz's Chief Operations Officer. In his declaration, McGrath states that "[f]or a third-party licensee to install[] [and] activate…NearPoint software on an email mailbox, a third party is required to agree to Zantaz's EULA to complete the software installation and activation." (ECF No. 37-2, PageID.1100.) McGrath also states that "MyMichigan had to scroll through the terms of the EULA before

selecting 'I agree[,]'" and would not be able "to install [NearPoint] without scrolling through the EULA and selecting 'I agree.'" (*Id.* at PgID.1101.)

MyMichigan asserts that McGrath's declaration is inadmissible because McGrath lacks personal knowledge concerning NearPoint's installation, as evidenced by his deposition testimony. (ECF No. 40, PageID.1639–44); *Colton v. Scutt*, No. 10-13073, 2011 WL6090152, at *3 (E.D. Mich. Dec. 7, 2011). McGrath, however, is a corporate officer, and corporate officers "are considered to have personal knowledge of the acts of their corporations," such that "an affidavit setting forth those facts is sufficient for summary judgment." *Fambrough v. Wal-Mart Stores, Inc.*, 611 Fed. App'x 322, 330 (6th Cir. 2015) (internal quotation marks omitted) (quoting *AGI Realty Serv. Grp., Inc. v. Red Robin Inern., Inc.*¸ 81 F.3d 160 (6th Cir. 1996) (unpublished)).

While the Court may consider McGrath's affidavit at the summary judgment stage, that does not mean a jury would have to accept his statements as true. MyMichigan has proffered evidence indicating that McGrath does not understand NearPoint's installation process and that NearPoint does not operate in the manner McGrath described. During his deposition, McGrath stated that he never personally installed NearPoint, did not know how NearPoint was installed by MyMichigan, and did not know how MyMichigan archived emails using NearPoint software. (ECF No. 38-16, PageID.1426–27.) Additionally, Joshua Church, a MyMichigan

employee who managed NearPoint software, explained at his deposition that NearPoint was never installed on individual email mailboxes. (ECF No. 38-21, PageID.1520.) Specifically, Church stated that "[t]here was never anything presented [by NearPoint] that would require installation[.]" (*Id.*) Rather, NearPoint automatically "detects" when a new email mailbox is created in MyMichigan's Microsoft Exchange server "and automatically begins archiving that mailbox." (*Id.* at PageID.1521.) Because NearPoint was never installed and activated for every email mailbox, MyMichigan would never have been prompted with an EULA clickwrap agreement to accept.

The conflicting evidence on the record creates a genuine dispute of material fact concerning whether MyMichigan had notice of the EULA, and therefore, agreed to be bound by its terms. "[A]ssessments of credibility[,]" weight of the evidence, "and choices between conflicting versions of the events are matters for the jury, not for the Court on summary judgment." *Jeffreys v. New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)); *see also Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

The cases *Castro v. Jem Leasing, LLC*, and *Mejia v. Linares*, cited by MyMichigan, do not change the Court's conclusion. *See Castro v. Jem Leasing, LLC*, 214 A.D.3d 475, 475–76 (N.Y. App. Div. 2023); *Mejia v.* Linares, 219 A.D.3d 1251, 1251–52 (N.Y. App. Div. 2023). In *Castro*, Uber argued that a valid

clickwrap agreement existed between the parties by offering evidence of the clickwrap agreement's terms at the time the plaintiff registered for Uber's rideshare application. 214 A.D.3d at 475–76. The court concluded, however, that the evidence provided by Uber failed to establish that the rideshare application included a valid clickwrap agreement, or that the plaintiff agreed to the terms of the clickwrap agreement when the plaintiff registered for the application. *Id.* In *Mejia*, in contrast, Uber attempted to prove the existence of a valid clickwrap agreement by providing an explanation of their application's registration process, and submitted a screenshot of the application's clickwrap agreement, which stated, "[b]y clicking 'Create Account,' you agree to Uber's Terms and Conditions." 219 A.D.3d at 1252. The court concluded that the evidence provided by Uber was sufficient to establish that a valid clickwrap agreement existed, and that the plaintiff assented to the clickwrap agreement by using the application. *Id.*

Like *Castro*, the evidence provided by Zantaz does not establish that no genuine dispute of material fact exists. *See Mejia*, 214 A.D.3d at 475–76. Here, Zantaz merely provided a document containing the EULA's terms and McGrath's declaration. Zantaz *did not provide* a screenshot of the EULA clickwrap agreement, illustrating the scroll bar and "I agree" button that MyMichigan users would allegedly use to download and install NearPoint. Whether MyMichigan actually

received notice of the EULA and agreed to its terms is still an open question, which is for the jury to decide.

Accordingly, the record presents a genuine dispute of material fact concerning whether MyMichigan assented to the EULA and whether the EULA was an enforceable contract governing the parties' relationship.

**2. The 2016 License Agreement**

Having determined that genuine issues of material fact exist concerning whether the EULA was an enforceable contract, the Court next considers whether the 2016 License Agreement became the parties' governing agreement. The Court concludes that genuine issues of material fact likewise exist concerning whether both parties intended to be bound by the 2016 License Agreement.

MyMichigan contends that the Uniform Commercial Code ("UCC") applies to the 2016 License Agreement, which means that the 2016 License Agreement does not need to be signed by both parties to be enforceable. Specifically, MyMichigan argues that the 2016 License Agreement constitutes a confirmatory writing which is an exception to the statute of frauds. The 2016 License Agreement, however, does not fall within the confirmatory writing exception of the statute of frauds because the UCC, as adopted under New York law, does not apply to software license agreements.

The UCC defines the term "good" as "all things movable" at the time of contract for sale, other than the money being paid, as well as certain other movable property. *See Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 432 (S.D.N.Y. 1996) (first citing *Colonial Life Ins. Co. of Am. v. Electronic Data Sys. Corp.*, 817 F. Supp. 235, 239 (D.N.H. 1993); and then citing *Commc'ns Grps., Inc. v. Warner Commc'ns, Inc.*, 527 N.Y.S.2d 341, 344 –45 (N.Y. Civ. Ct. 1987)). Although software is generally considered a "good," even when its development reflects substantial programming services, licenses are treated differently when they do not transfer incidents of ownership. *See id.* "[C]opyrights, patents, and trademarks are classified as 'general intangibles' under the UCC" and are generally distinguished from "goods." *Id.* (citing N.Y. U.C.C. Law § 9–106 (McKinney 1990)). A license may nevertheless be considered a "good" when it transfers some incidents of ownership. *Id.* (citations omitted).

Neither the EULA nor the 2016 License Agreement transferred any "incidents of ownership" in NearPoint to MyMichigan. Instead, both agreements granted MyMichigan only the right to use the software. The EULA expressly stated that "[n]o title to or ownership of [NearPoint] is transferred to the licensee[,]" while the 2016 License Agreement provided that Zantaz "retains all right, title and interest in and to [NearPoint.]" (ECF No. 37-1, PageID.1106; ECF No. 38-8 PageID.1386.) The agreements therefore concerned the licensing of NearPoint, not

the transfer of ownership. Accordingly, the UCC's confirmatory writing exception does not apply.

However, the absence of signatures does not necessarily render the 2016 License Agreement unenforceable. "An unsigned contract may be enforceable when objective evidence establishes that the parties intended to be bound." *Flores v. Lower E. Side Serv. Ctr., Inc.,* 828 N.E.2d 593, 597 (N.Y. 2005). To determine whether the parties manifested an intent to be bound, courts examine the parties' "expressed words and deeds." *Brown Bros. Elec. Contrs. v. Beam Constr. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977). Email exchanges may constitute an enforceable contract, even when a party later fails to sign implementing documents, provided that the communications are "sufficiently concrete and clear" to establish an intent to be bound. *Williams v. Delsener*, 59 A.D.3d 291, 292 (N.Y. App. Div. 2009) (first citing *Hallock v. New York*, 474 N.E.2d 1178 (1984); and then citing *Katzen v. Twin Pines Fuel Corp.*, 16 A.D.2d 133 (2005)). The enforceability of the 2016 License Agreement therefore does not turn solely on whether the parties signed it. Rather, the question is whether the parties' words and conduct objectively demonstrate an intent to enter into a binding contract.

The evidence here creates a genuine issue of fact concerning whether Zantaz intended to be bound by the 2016 License Agreement. After the parties negotiated the 2016 License Agreement, their subsequent course of performance could lead a

reasonable jury to conclude that Zantaz did not assent to its terms. Consider, for example, one of the key disputes between the parties: did their agreement require MyMichigan to pay for NearPoint that was being used on all mailboxes, or only on mailboxes of "active users." In 2018—long after the 2016 License Agreement was exchanged between the parties—MyMichigan asked Zantaz to clarify the definition of a NearPoint license. (ECF No. 37-12.) Zantaz responded that "[one] license equates to [one] user['s] mailbox." (*Id.*) Similarly, although Zantaz provided MyMichigan with a new quote for NearPoint licenses reflecting the terms of the 2016 License Agreement and MyMichigan submitted a corresponding purchase order, the record contains no corresponding invoice showing that Zantaz fulfilled the purchase order pursuant to the 2016 License Agreement's terms.

Given these conflicting communications and the unclear course of performance by the parties, the Court cannot say that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law. *Villegas*, 709 F.3d at 568. Whether the parties intended to be bound by the 2016 License Agreement depends on credibility assessments and inferences drawn from conflicting evidence, and therefore, "must be made by the trier of fact." *Brighton Inv., Ltd. v. Har-ZVI*, 88 A.D.3d 1220, 1223 (N.Y. App. Div. 2011) (citing *Pozament Corp. v. AES Westover, LLC*, 27 A.D.3d 1000, 1001–02 (N.Y. App. Div. 2006)).

### B. Unjust Enrichment

Zantas alternatively argues that, if the Court determines that the EULA does not govern the parties' relationship, Zantaz is entitled to summary judgment on MyMichigan's liability for unjust enrichment.

Because an unjust enrichment claim implies that the parties did not have a valid contract governing their relationship, the Court traditionally must perform a choice of law analysis. A choice of law analysis is unnecessary, however, "when there is no conflict regarding the law between different states." *Saab Auto. AB v. Gen. Motors Co.*, 953 F. Supp. 2d 782, 787 (E.D. Mich. 2013). Under both New York and Michigan law, an unjust enrichment claim cannot be sustained when a valid enforceable contract governs the same subject matter. *CBS Broad. Inc. v. Jones*, 460 F. Supp. 2d 500, 506 (S.D.N.Y. 2006) (quoting *Eagle Comtronics, Inc. v. Pico Prods., Inc.*, 246 A.D.2d 1202, 1202 (N.Y. App. Div. 1998)); *King v. Ford Motor Credit Co.*, 668 N.W.2d 357, 371 (Mich. Ct. App. 2003) (citing *Barber v. SMH (US), Inc.*, 509 N.W.2d 791 (1993)). Given that there are genuine issues of material fact concerning whether either the EULA or the 2016 License Agreement are valid enforceable contracts, the Court cannot—at this stage of the proceedings—determine whether an unjust enrichment claim is applicable to this case. Therefore, neither party is entitled to summary judgment as to Zantaz's unjust enrichment claim.

## III. CONCLUSION

For the foregoing reasons, Zantaz's motion for partial summary judgment is DENIED, and MyMichigan's motion for summary judgment is DENIED.

SO ORDERED.

s/Michael C. Martin
Hon. Michael C. Martin
United States District Judge

Dated: November 19, 2026